## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROQUETTE FRÈRES, S.A., | |
| Plaintiff and Counter-Defendant, | |
| v. | C.A. No. 14-1442-SLR |
| SOLAZYME, INC., | |
| Defendant and Counterclaimant. | |
| ROQUETTE FRÈRES, S.A., | |
| Plaintiff and Counter-Defendant, | |
| v. | C.A. No. 15-0125-SLR |
| SOLAZYME, INC., | |
| Defendant and Counterclaimant. | |

## OPENING BRIEF IN SUPPORT OF MOTION FOR ORDER CONFIRMING ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 58

OF COUNSEL:

Daralyn J. Durie
Joshua H. Lerner
Laura E. Miller
Timothy C. Saulsbury
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111-3007
(415) 362-6666
ddurie@durietangri.com
jlerner@durietangri.com
lmiller@durietangri.com
tsaulsbury@durietangri.com

Dated:  March 11, 2015

Frederick L Cottrell, III (#2555)
Chad M. Shandler (#3796)
Selena E. Molina (#5936)
RICHARDS, LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
shandler@rlf.com
molina@rlf.com

*Attorneys for Defendant and Counterclaimant Solazyme, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

I.      NATURE AND STAGE OF THE PROCEEDINGS ......................................................... 1

II.     SUMMARY OF THE ARGUMENT ................................................................................ 2

III.    STATEMENT OF FACTS ............................................................................................... 2

        A.      The Background of the Dispute Submitted to Arbitration ........................................ 2

        B.      The Parties Agreed To Submit Their Disputes To Final, Non-Appealable
                Arbitration .............................................................................................................. 5

        C.      The Arbitral Proceedings ........................................................................................ 5

        D.      The Panel's Award Expressly Rejected Both Roquette's Jurisdictional
                Objections And Its Claims On The Merits ............................................................... 9

IV.     ARGUMENT .................................................................................................................. 11

        A.      Legal Standard ..................................................................................................... 11

        B.      The Court Should Confirm The Award Because Solazyme's Petition
                Satisfies All Statutory Requirements .................................................................... 11

        C.      Roquette's Jurisdictional Arguments Have Been Repeatedly Rejected
                By The Panel In Findings Entitled To Extreme Deference ................................... 12

                1.      The Parties Agreed That Questions About The Scope Of The
                        Arbitrators' Jurisdiction Were To Be Determined By The Panel .................. 13

                2.      Roquette Cannot Show That The Panel's Jurisdictional
                        Determinations Were "Completely Irrational" ............................................. 14

                        a.      Roquette's Objection Based On The Timing Of The Award ................ 15

                        b.      Roquette's Objection Based On The Material Transfer Agreement ...... 17

V.      CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amalgamated Meat Cutters v. Cross Bros. Meat Packers, Inc.*,
    518 F.2d 1113 (3d Cir. 1975)................................................................11

*Bouton v. Gov't of the V.I.*,
    987 F.2d 162 (3d Cir. 1993)............................................................11, 20

*Chesapeake Appalachia, LLC v. Burkett*,
    No. 3:13-3073, 2014 WL 5312829 (M.D. Pa. Oct. 17, 2014) ................13

*Daihatsu Motor Co. v. Terrain Vehicles, Inc.*,
    13 F.3d 196 (7th Cir. 1993) ...............................................................12

*Dluhos v. Strasberg*,
    321 F.3d 365 (3d Cir. 2003)............................................................11, 20

*Exxon Shipping Co. v. Exxon Seamen's Union*,
    993 F.2d 357 (3d Cir. 1993)............................................................15, 20

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995)................................................................11, 13, 20

*Gov't of V.I., Dep't of Justice v. United Indus. Workers of N. Am.*,
    987 F. Supp. 439 (D.V.I. 1997) ......................................................12, 20

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008)................................................................11, 12, 14

*Marine Transit Corp. v. Dreyfus*,
    284 U.S. 263 (1932)................................................................12

*Millennium Validation Services, Inc. v. Thompson*,
    No. 02-1430 (GMS), 2006 WL 3159821 (D. Del. Nov. 3, 2006)...........15

*Mobil Oil Corp. v. Indep. Oil Workers Union*,
    679 F.2d 299 (3d Cir. 1982)................................................................11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)................................................................14

*Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*,
    868 F.2d 52 (3d Cir. 1989)................................................................11

*Opalinski v. Robert Half Int'l, Inc.*,
   761 F.3d 326 (3d Cir. 2014).............................................................................13

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
   724 F.3d 1069 (9th Cir. 2013) .........................................................................14

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*,
   687 F.3d 671 (5th Cir. 2012) ...........................................................................14

*Qualcomm Inc. v. Nokia Corp.*,
   466 F.3d 1366 (Fed. Cir. 2006).......................................................................14

*Southco, Inc. v. Reell Precision Mfg. Corp.*,
   556 F. Supp. 2d 505 (E.D. Pa. 2008) .......................................................14, 15

**STATUTES & RULES**

9 U.S.C. § 9.........................................................................................................12

## I. NATURE AND STAGE OF THE PROCEEDINGS

Defendant/Counterclaimant Solazyme, Inc. ("Solazyme") respectfully requests that the Court confirm a February 19, 2015 final award (the "Award") issued in an arbitration between Solazyme and Plaintiff/Counter-Defendant Roquette Frères, S.A. ("Roquette"). The Award complies with the requirements of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, and the arbitral panel (the Honorable Paul Michel, the Honorable Charles Renfrew, and Professor Eric Green, collectively the "Panel") considered and unanimously rejected Roquette's objections.

The Panel's Award represents the culmination of a painstaking arbitration concerning the assignment of intellectual property developed during the life of an unsuccessful joint venture between the parties. In the joint venture agreements, the parties agreed that improvements to each partner's intellectual property would be returned to the contributing party upon the joint venture's dissolution. Prior to the joint venture, Roquette possessed no products that were "in any way similar to those contributed by Solazyme," and all of the joint venture's intellectual property improved upon the intellectual property Solazyme contributed to it. *See* Ex. A (Arbitration Award) at 30-31.[1] The Panel further found that Roquette surreptitiously copied patent applications filed by the joint venture, deleted the names of the Solazyme inventors, and refiled those applications in Roquette's name alone. *Id*. at 17-18. And, even after the joint venture dissolved, Roquette continued to file applications in its own name on intellectual property that, pursuant to the terms of the joint venture agreements, belonged to Solazyme. These Roquette patent applications came to light only when they were published. When the Panel ordered Roquette to provide discovery regarding these shadow patent applications, Roquette refused to comply and filed this lawsuit seeking preemptively to vacate the Panel's

---

[1] Filed concurrently with the present motion is the Declaration of Timothy C. Saulsbury, with exhibits. References to "Ex. __" are to the exhibits attached to this declaration.

Award on the theory that the Panel divested itself of jurisdiction when it ordered the additional discovery. The Panel considered and rejected Roquette's arguments, and ordered that all of the joint venture's patent applications and know-how at issue, including the shadow patent applications, be assigned to Solazyme. The Panel also awarded Solazyme its fees and costs based on Roquette's misconduct. *Id*. at 32. The Panel's Order directed Roquette to identify the patent applications at issue within 5 days of the order. *Id*. at 36. Roquette has failed to comply with that directive as well.

The Federal Arbitration Act ("FAA" or "Act") was enacted to ensure speedy and summary confirmation of arbitration awards. Solazyme respectfully requests that this Court promptly confirm the Award and enter judgment on the Award so that the joint venture's patent applications can be transferred to Solazyme, which will then assume responsibility for the prosecution of those applications. Without prompt action, Solazyme faces the serious risk that Roquette will try to torpedo the patent applications before the assignment can take place.

## II.  SUMMARY OF THE ARGUMENT

1. Pursuant to the "streamlined treatment" of arbitration awards under the FAA, the Panel's Award "must" be confirmed because it meets all statutory requirements.

2. Roquette has no viable basis for challenging the Award because the Panel correctly rejected both of its jurisdictional objections in decisions subject to extreme deference.

## III.  STATEMENT OF FACTS[2]

### A.  The Background of the Dispute Submitted to Arbitration

The dispute submitted to the Panel relates to the disposition of the intellectual property assets of a joint venture between Solazyme and Roquette to commercialize Solazyme's "breakthrough" new food ingredients.

---

[2] Additional background concerning the underlying dispute and the arbitral proceedings may be found in the Panel's Award, which is attached hereto as Ex. A and is incorporated by reference.

Solazyme is a South San Francisco-based biotechnology company focused on developing new products derived from microalgae, including biofuels. Ex. A (Award) at 1. In nature, microalgae are typically green, high in chlorophyll, and have a strong taste that many people find unappealing. *Id*. at 11. Solazyme grew microalgae using a fermentation process that takes place in the dark, resulting in a product with very low levels of chlorophyll that is yellow rather than green. *Id*. In studying the profile of the oil produced under these conditions by one particular type of microalgae, Solazyme discovered that it was similar to olive oil in its properties. *Id*. From these insights, Solazyme developed the two new food ingredients central to the dispute: (1) a neutral tasting, yellow "algal flour" that can be used as a fat replacement to make finished food products that are lower in fat and calories but have the taste and texture of full-fat products, and (2) a neutral tasting, yellow high protein algal powder. *Id*. at 10-11.

In January 2009, Solazyme reached out to Roquette as a potential commercialization partner. Roquette personnel sampled the Solazyme products and were impressed. *Id*. at 11. Following extensive negotiations, the parties signed a Joint Venture and Operating Agreement (the "JVOA"). *Id*. at 11-13; Ex. B (JVOA). The parties agreed that, in exchange for their respective 50 percent shares of the joint venture, Roquette's contribution would be primarily in the form of money and manufacturing capacity, while Solazyme's contribution would be primarily in the form of its technology and intellectual property. Ex. A at 12-13. The joint venture was named "Solazyme Roquette Nutritionals" or "SRN."

The JVOA had a three-part structure for the disposition of the intellectual property of the joint venture upon its dissolution: Improvements to Solazyme's intellectual property would be assigned to Solazyme, Improvements to Roquette's intellectual property would be assigned to Roquette, and any remaining intellectual property would be shared by both parties. *Id*. at 22-24; Ex. B (JVOA) § 21.1(c). Both Solazyme and Roquette also signed intellectual property license

agreements with the joint venture. Ex. A (Award) at 2; *see also* Exs. C & D. The parties, along with SRN, further executed a Services Agreement, a Manufacturing Agreement, and a Material Transfer Agreement. Exs. E-G.

Solazyme contributed to SRN the high lipid algal flour and high protein algal powder products it had developed and the processes for making them. Ex. A at 15. Solazyme also gave the joint venture a license to over 50 patent applications covering its processes for making these two algal products, and contributed samples of its products and the algae strain used to make them. *Id*. at 13 n.2; Ex. C (Solazyme License Agmt.) at Exhibit A-1, A-2 & B. Over time, the joint venture made improvements to those products and processes. Ex. A at 15.

During the course of the joint venture, the most difficult task was transfer of Solazyme's intellectual property and technology to Roquette, which was to carry out manufacturing on behalf of SRN. *Id.* at 16. Despite many challenges, the transfer ultimately was deemed "successful" by Roquette. *Id*. Notwithstanding this success, and over Solazyme's objection, Roquette decided to terminate the joint venture and ceased funding it. *Id*. Thanks to its access to Solazyme's intellectual property, Roquette now knew how to make the products in question. *Id*. at 16-17. Indeed, an internal Roquette presentation reported: "Significant progress has been accomplished to master the technology and Roquette has acquired know-how." *Id*. at 17.

The impact on Solazyme was immediate and devastating. Roquette stopped funding SRN just as it had become prepared to launch commercially, and Roquette did, in fact, commercially launch with SRN's products shortly thereafter. *Id*. at 19-20. Thus, not only did Solazyme suffer years of setback, but it now faced competition on its *own* products from a competitor that previously had nothing "in any way similar" to Solazyme's revolutionary products, and whom Solazyme had spent nearly three years educating. *Id*. at 30-31.

### B. The Parties Agreed To Submit Their Disputes To Final, Non-Appealable Arbitration

The JVOA contains a broad arbitration clause that requires the parties to submit any disputes "arising out of or connected with . . . this Agreement." Ex. B (JVOA) § 22.3(b). The "Agreement" is defined as "this Joint Venture and Operating Agreement, as amended from time to time." Ex. B (JVOA) at Exhibit A-1. The JVOA, in turn, contained an Entire Agreement provision, which incorporated a series of additional agreements that, "taken together, collectively represent the entire understanding and agreement between the Parties with respect to the subject matter of and the transactions contemplated by this Agreement." Ex. B § 23.15.[3]

The parties further agreed that the arbitration award "shall be final and binding," and the parties expressly "waive[d] any right to appeal the arbitration award." *Id.* § 22.3(b). Further, by incorporating into the JVOA the Arbitration Rules of the Center for Public Resources (the "CPR Rules"), the parties agreed that the arbitrators, rather than the courts, would "have the power to hear and determine challenges to its jurisdiction, including any objections with respect to the . . . scope . . . of the arbitration agreement." Ex. H (CPR Rules) at Rule 8.1; *see infra* § II.D.1.

The JVOA's arbitration clause is thus notable not just for its breath—it encompasses any dispute "arising out of or **connected with** . . ." the JVOA—but also for its extreme deference to the arbitral process, including the express waiver of "**any right** to appeal the award" and the agreement to delegate to the arbitrators any issues concerning the scope of their jurisdiction.

### C. The Arbitral Proceedings

The parties served simultaneous arbitration demands on September 24, 2013. Roquette

---

[3] Subsequent to the execution of the JVOA, SRN and Roquette entered into a Material Transfer Agreement, acknowledged and signed by Solazyme, that included an amended Entire Agreement provision setting forth the full scope of the parties' agreement. *See* Ex. G § 8.4 (incorporated by reference from the Manufacturing Agreement (Ex. F)). This provision modified and amended the Entire Agreement provisions found within the earlier documents, including the JVOA. As such, the entire agreement of the parties includes six documents: the JVOA, the Solazyme License Agreement, the Roquette License Agreement, the Services Agreement, the Manufacturing Agreement, and the Material Transfer Agreement. *See* Ex. A (Award) at 2 n.1.

asked for an award that it was a joint owner of SRN's intellectual property. Solazyme asked for an award that it was the sole owner of SRN's intellectual property because all of SRN's intellectual property improved upon the intellectual property Solazyme contributed to SRN. The Panel consisted of the Honorable Paul R. Michel (formerly the Chief Judge of the Federal Circuit), Professor Eric D. Green (formerly of Boston College and Harvard Law School), and the Honorable Charles B. Renfrew (formerly a District Judge of the Northern District of California and United States Deputy Attorney General).

During the course of the arbitration, Solazyme learned that, during the joint venture, Roquette had surreptitiously filed multiple patent applications in its own name based on patent applications filed by SRN. As just one example, on October 17, 2012, SRN filed U.S. Provisional Patent Application (61/715,031) relating to material dried using a Filtermat dryer, listing Roquette and Solazyme personnel as inventors. On October 26, 2012, just nine days later, Roquette secretly filed a European Patent Application (EP2724625) claiming virtually identical subject matter as the earlier SRN Patent Application but deleting the Solazyme employees as inventors. *Compare* Ex. I (61/715,031) *with* Ex. J (EP2724625); *see also* Ex. A (Award) at 17. Solazyme first learned of this filing after the application was published on April 30, 2014. *See* Ex. A at 17-19 (documenting further details about Roquette's shadow applications).[4] Roquette filed these applications even though its head of intellectual property, Bruno Quenon, was aware that Roquette was not the owner of the patent application directed to spray drying with Filtermat-type technology. *See* Ex. A at 18 (quoting Ex. N (July 2, 2011 Quenon Email)). Roquette did not produce these shadow patent applications in discovery.

The Parties submitted multiple rounds of briefing and presented witnesses during a six-

---

[4] Even to this day, Solazyme continues to learn of new shadow applications filed by Roquette as they publish. Indeed, just last month, three additional Roquette patent applications relating to Solazyme's high lipid algal flour and high protein algal powder have published. *See* Exs. K-M.

day evidentiary hearing in New York, from September 25, 2014 to October 2, 2014. In connection with the Panel's request for post-hearing briefing, the Panel and parties consented to continue the hearing and keep it open even after the submission of a first round of post-hearing briefs in the event that "a second round of follow-up briefing" was required. Ex. A at 7-8.

Following the evidentiary hearing, but before the submission of post-hearing briefs, Solazyme learned of more patent applications that Roquette had secretly filed in its own name based on the work of SRN. Because Roquette had failed to produce the patent applications in discovery, Solazyme had not had the opportunity to raise them at the evidentiary hearing, and therefore submitted the applications to the Panel for consideration in connection with post-hearing briefing. *See* Ex. O (Oct. 22, 2014 Miller Email to Panel). After reviewing the parties' post-hearing submissions, the Panel concluded that "it may need additional evidence and submissions" to address: (1) whether "there should be an award of attorneys' fees and costs"; and (2) whether "the parties should engage in further discovery with respect to the existence of additional patent applications filed by Roquette which were discovered only after the close of the evidentiary portion of the hearing in this matter." Ex. A at 3. Thus, on November 17, 2014, the Panel ordered that "any party seeking attorneys' fees and costs and/or additional discovery" shall file such motions by December 1, 2014. *Id.*; Ex. P (Nov. 17, 2014 Order).

By letter served on November 28, 2014, Roquette objected to the November 17, 2014 order on the grounds that the Panel had divested itself of jurisdiction because it had failed to issue an award within fifteen days after the conclusion of the arbitration hearing. *See* Ex. Q (Nov. 28, 2014 Goehring Email). Solazyme responded to Roquette's letter on December 2, 2014, explaining that Roquette's jurisdictional challenge should be rejected because the Panel had provided express notice that there may be "a second round of follow-up briefing," to which Roquette had consented. *See* Ex. R (Dec. 2, 2014 Durie Letter to Panel) at 1. The Panel

subsequently rendered an order rejecting Roquette's objections to its jurisdiction and instructing Roquette to follow the procedures set forth in the November 17, 2014 order. With respect to its jurisdiction, the Panel concluded:

> The only common sense interpretation of the Article 22.3(b)'s 15 day time limit for the rendering of an Award is that the time does not begin to run until the deadline for final responses and replies to the Panel's additional questions and requests for briefing or the filing of additional Motions and responses and replies, and the Panel so rules pursuant to CPR Rule 22.

Ex. S (Dec. 4, 2014 Order) at 2.

Pursuant to the Panel's November 17, 2014 order, Solazyme submitted a motion on December 1, 2014 seeking attorneys' fees and further discovery regarding the patent applications Roquette filed in its own name. Ex. T. Roquette responded by letter on December 15, 2014. Rather than provide a substantive response to Solazyme's motion for additional discovery, Roquette instead repeated its position that any future award by the Panel would be "invalid and unenforceable." Ex. A at 4; Ex. U. In addition to its prior contention that the Panel lacked jurisdiction because it had failed to render a timely award, Roquette further asserted that the Panel lacked jurisdiction to address whether Roquette's filing of applications in its own name was a breach of the parties' December 16, 2010 Material Transfer Agreement. *See* Ex. U at 2. On December 23, 2014, the Panel granted Solazyme's request for additional discovery and set forth a schedule for further discovery and submissions that gave Solazyme until February 9, 2015 to conduct its additional discovery. Ex. V (Dec. 23, 2014 Order) at 2. The Panel also expressly rejected both of Roquette's jurisdictional challenges. *See id.* at 1-2.

On December 29, 2014, Solazyme wrote a letter to Roquette repeating its discovery requests and asking when Roquette would comply with the Panel's order. Ex. A at 5. Roquette "failed to respond in any way" to the letter and altogether "refused to comply with the Panel's" December 23, 2014 order. *Id.* On February 4, 2015, based on Roquette's refusal to comply,

Solazyme informed the Panel that it intended to seek an adverse inference and final ruling. *See* Ex. W. The Panel then issued two orders on February 10, 2015: one seeking identification from Solazyme of the patent applications filed by Roquette and a second informing the parties that the hearing closed as of February 9, 2015. *See* Exs. X & Y. The following day, Solazyme responded with a list of the applications of which it was aware, along with an adverse inference request based on Roquette's refusal to provide discovery. Ex. Z.

### D. The Panel's Award Expressly Rejected Both Roquette's Jurisdictional Objections And Its Claims On The Merits

On February 19, 2015, the Panel rendered its Award. Although it had already rejected Roquette's jurisdictional challenges in its orders of December 4 and 23, 2014, the Panel set forth four pages of additional detail supporting its "continuing jurisdiction" to address Roquette's "repeated[] challenge[s] [to] its jurisdiction." Ex. A at 6-10. In particular, the Panel explained that, under the CPR Rules, it had "the power to hear and determine challenges to its jurisdiction" and to "conduct the arbitration in such manner as it shall deem appropriate." *Id*. at 6-7 (citing CPR Rules 8.1 & 9.1). The Panel further recognized that it had the discretion to "require the parties to produce evidence in addition to that initially offered," along with the authority to "interpret and apply these [CPR] Rules insofar as they relate to the Tribunal's powers and duties." *Id*. at 7. The Panel concluded:

> This is exactly what the Panel has done. It has required that the parties produce additional evidence and it has interpreted and applied these Rules as they relate to jurisdiction.

*Id*.

The Award also rejected each of Roquette's claims on the merits. In particular, the Panel found that, prior to the joint venture, Roquette did not possess either of the products Solazyme contributed to SRN and upon which SRN improved during the joint venture: a high lipid algal flour and a high protein algal powder. *Id*. at 19. Based on the access to Solazyme's intellectual

property it gained through the joint venture, Roquette learned how to make each of the products Solazyme contributed to SRN. *Id*. at 18. Upon acquiring that know-how, Roquette sought to dissolve SRN to seek control over the products and related intellectual property. *Id*. at 18-19.

With respect to the patent applications Roquette filed in its own name, the Panel found that "during the life of the Joint Venture, Roquette surreptitiously, and without notice to Solazyme, filed patent applications on its own behalf" based on SRN's work. *Id*. at 17. The Panel further found that "Roquette is presently attempting to patent intellectual property in its own name" that "are based upon intellectual property and products that Solazyme contributed to the Joint Venture" that SRN "improved [upon] as reflected in the patent applications filed by SRN." *Id*. at 30. The Panel noted that, although it would be inclined to grant Solazyme's request for an adverse inference based on Roquette's refusal to comply with discovery orders, the adverse inference was not necessary to its conclusions. *Id*. at 30 n.3. Moreover, the Panel rejected Roquette's contention that SRN's intellectual property also improved on Roquette's intellectual property and, thus, should be jointly assigned to Roquette and Solazyme. Indeed, the Panel found that Roquette did not previously possess any products that were "***in any way similar***" to those contributed by Solazyme and worked upon by SRN. Ex. A at 30-31.

Based on these findings, made in light of the extensive evidentiary record before it, the Panel concluded that Solazyme was entitled to an assignment of: (1) all of the patent applications currently assigned to SRN; (2) all of SRN's know-how relating to the two products Solazyme contributed to SRN and the processes for making those products; and (3) all Roquette patent applications filed on or after November 3, 2010 relating to microalgal foods, microalgal food ingredients, and microalgal nutritionals, as well as all methods relating to making and using the same. *Id*. at 31, 33-37. The Panel also awarded Solazyme its attorneys' fees and costs based on a litany of Roquette's improper conduct. *See id*. at 32 & n.4 (outlining seven categories of

misconduct).  The Panel also ordered relief as set forth on pages 35-37 of the Award to ensure that the patent applications be assigned to Solazyme in a timely fashion.  Ex. A.

## IV.  ARGUMENT

### A.  Legal Standard

The Federal Arbitration Act provides for "expedited judicial review" to confirm, vacate, or modify arbitration awards.  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008). In view of these expedited procedures, a court's function in confirming or vacating a commercial arbitration award is "narrow in the extreme" and is "extremely deferential."  *Amalgamated Meat Cutters v. Cross Bros. Meat Packers, Inc.*, 518 F.2d 1113, 1121 (3d Cir. 1975); *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003).  Arbitration awards are set aside only in "very unusual circumstances," and there is a "strong presumption in favor of the [arbitration] award." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995); *Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir. 1989).

Thus, courts "must" confirm an award "if the arbitrator's interpretation can *in any rational way* be derived from the [underlying] agreement."[5]  *Mobil Oil Corp. v. Indep. Oil Workers Union*, 679 F.2d 299, 302 (3d Cir. 1982); *Bouton v. Gov't of the V.I.*, 987 F.2d 162, 170 (3d Cir. 1993) (vacating or refusing to recognize or execute the arbitration award would be proper only "if the record before the arbitrator reveals *no support whatsoever* for the arbitrator's determination . . . .").  A district court may "affirm easily" an arbitration award "under this extremely deferential standard."  *Dluhos*, 321 F.3d at 370.

### B.  The Court Should Confirm The Award Because Solazyme's Petition Satisfies All Statutory Requirements.

Under Section 9 of the FAA, petitions to confirm an arbitration award are subject to "streamlined treatment," and a court "must" confirm the award "unless it is vacated, modified, or

---

[5] Emphasis supplied and internal citations omitted unless otherwise noted.

corrected as prescribed in §§ 10 and 11." *Mattel*, 522 U.S. at 582. Section 10 of the Act lists the grounds for vacating an award, while Section 11 provides the grounds for modifying or correcting one. *Id*. These two sections provide the FAA's "exclusive regimes for the review." *Id*. at 590.

Solazyme has satisfied all the statutory requirements for confirmation. As a threshold matter, this petition is timely. The Panel served its Award on February 20, 2015. Ex. AA. Solazyme served its petition on February 26, 2015, which is well within the FAA's one-year deadline. *See* 9 U.S.C. § 9.

Additionally, the JVOA satisfies Section 9's requirement that "the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration." 9 U.S.C. § 9. The JVOA is express that the "award of the arbitrator shall be final and binding and may be enforced by any court having jurisdiction." Ex. B (JVOA) § 22.3; *see Gov't of V.I., Dep't of Justice v. United Indus. Workers of N. Am.*, 987 F. Supp. 439, 446 (D.V.I. 1997) (finding that a provision that the "award . . . shall be enforceable in any court of competent jurisdiction" satisfies Section 9).[6]

Finally, as documented below, because there are no viable bases for vacating or modifying the Award, it "must" be confirmed. *Mattel*, 522 U.S. at 581.

### C. Roquette's Jurisdictional Arguments Have Been Repeatedly Rejected By The Panel In Findings Entitled To Extreme Deference

As documented above, the Panel has already rejected *both* of the jurisdictional challenges raised in Roquette's declaratory judgment actions. *See supra* § I.C-D. In each case, the Panel invoked its authority under the CPR rules to "determine challenges to its jurisdiction, including

---

[6] Indeed, the parties' agreement that the award "shall be final and binding," without more, is sufficient. *See Marine Transit Corp. v. Dreyfus*, 284 U.S. 263, 268, 276 (1932) (finding "final and binding" sufficient); *Daihatsu Motor Co. v. Terrain Vehicles, Inc.*, 13 F.3d 196, 196 (7th Cir. 1993) (finding "finally settled" sufficient).

any objections with respect to the . . . scope . . . of the arbitration agreement." *See* Ex. H at Rule 8.1. The parties stipulated to arbitration rules that vest that power in the arbitrators. Even had they not done so, the Panel's jurisdictional decisions would be reviewable only under the "completely irrational" standard for challenges under §§ 10(a)(4) and 11(b). *See infra* § II.D.3. Far from "completely irrational," the Panel's jurisdictional decisions were substantively correct.

### 1. The Parties Agreed That Questions About The Scope Of The Arbitrators' Jurisdiction Were To Be Determined By The Panel

"Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed." *Kaplan*, 514 U.S. at 943. Where the parties' agreement is silent, there is a presumption that the court will decide which issues are arbitrable. *Opalinski v. Robert Half Int'l, Inc.*, 761 F.3d 326, 335 (3d Cir. 2014). However, where an agreement incorporates rules giving the arbitrator power to rule on her own jurisdiction, "the parties' incorporation of those rules demonstrates a clear and unmistakable intent to delegate issues of arbitrability to the arbitrator." *Chesapeake Appalachia, LLC v. Burkett*, No. 3:13-3073, 2014 WL 5312829, at *4-6 (M.D. Pa. Oct. 17, 2014).

Here, the parties intended for issues of arbitrability to be decided by the arbitrators. Pursuant to Article 22.3 of the JVOA, the parties agreed that any legal disputes arising out of the agreement shall be "finally resolved by arbitration under the Arbitration Rules of the Center for Public Resources in New York" (the "CPR Rules"). Ex. B § 22.3(b). CPR Rule 8.1, in turn, provides that the "Tribunal shall have the power to hear and determine challenges to its jurisdiction, including any objections with respect to the . . . scope" of the agreement. Ex. H at Rule 8.1. By incorporating the CPR Rules into the JVOA, the parties "clearly and unmistakably" expressed their intent that questions of arbitrability be decided by the arbitrators. *Chesapeake*, 2014 WL 5312829, at *6 ("[V]irtually every circuit court to have considered the issue has found

that incorporation of [such rules] into an agreement constitutes clear and unmistakable evidence that the parties agreed to arbitrate issues of arbitrability") (collecting cases).[7]  Because issues of arbitrability were to be determined by the arbitrators, the Panel's jurisdictional rulings are final. *See Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1374-75 (Fed. Cir. 2006) (instructing that, because the parties had agreed to arbitrate arbitrability issues, the trial court "should not undertake to determine whether Nokia's assertions are in fact arbitrable").

### 2. Roquette Cannot Show That The Panel's Jurisdictional Determinations Were "Completely Irrational"

Even if the Court were to proceed to a substantive review of the Panel's Award, Roquette's challenge would fail.  The FAA reflects a "liberal federal policy favoring arbitration," under which doubts "concerning the *scope* of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Roquette's challenge is limited to the specific bases for vacatur or modification under §§ 10 and 11, all of which is reserved for "***egregious departures***" from the agreed-upon role of the arbitrators.  *Mattel*, 552 U.S. at 578, 586.

Because Roquette has not alleged corruption, fraud, or misconduct under § 10, or errors warranting modification under § 11 subsections (a) and (c), the only issues are whether the Award may be vacated under § 10(a)(4) or modified under § 11(b).  To obtain relief under either provision, the party challenging the award must establish that the terms of the arbitration award are "completely irrational."  *Southco, Inc. v. Reell Precision Mfg. Corp.*, 556 F. Supp. 2d 505,

---

[7] *See also Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1073-74 (9th Cir. 2013) (ruling that incorporation of the analogous UNCITRAL rule, which provides that the "arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement," constitutes "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability"); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (same with respect to the analogous AAA rule, which provides that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement").

511 (E.D. Pa. 2008). "For an award to be 'completely irrational,' it is not enough that a court finds that the arbitrators erred, but rather it must find that their decision ***escaped the bounds of rationality***." *Id.* In other words, there must be "no support in the record for its determination." *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993).

As documented below, the Panel's decisions were amply supported by the record and, thus, must be confirmed.

### a. Roquette's Objection Based On The Timing Of The Award

Roquette's first objection is based on a clause in Article 23.3 of the JVOA that provides: "[w]ithin fifteen (15) days after the conclusion of the arbitration hearing, the arbitrators shall issue a written award and statement of decision . . . ." Ex. B § 22.3(b). Although the JVOA does not specify the consequences of a failure to meet the 15-day deadline, Roquette contends that the requirement is jurisdictional,[8] and that the Panel was divested of jurisdiction because it failed to issue an award within the deadline.

The court rejected precisely this argument in *Millennium Validation Services, Inc. v. Thompson*, No. 02-1430 (GMS), 2006 WL 3159821, at *8 (D. Del. Nov. 3, 2006). Millennium argued that the arbitrator "exceeded his authority" by setting a subsequent hearing on attorneys' fees because that hearing exceeded a time limit on the arbitration hearing agreed to by the parties. *Id.* Finding no authority that "a time limit on an arbitration hearing agreed upon by the parties" could be grounds for an "exceeding authority" challenge, the court rejected the claim that a time limitation of the parties' creation could be grounds for vacatur. *Id.*

Here, the Panel found, and the record is clear, that no such default occurred because the arbitration hearing concluded on February 9, 2015, and the Award issued just ten days later on February 19, 2015. *See* Ex. A at 10; *supra* § I.C-D. Roquette appears to contend that the hearing

---

[8] Although not relied on by the Panel, Roquette's failure to establish that the 15-day provision is jurisdictional under the JVOA is an independent basis for rejecting its objection.

ended on November 3, 2014. *See* D.I. 1 (Roquette's Complaint) ¶ 27 ("The hearing closed on November 3, 2014"). However, on October 2, 2014, at the close of the evidentiary hearing, the Panel and parties consented to hold open the hearing for additional proceedings even *after* the submission the parties' first round of post-hearing briefs:

> ARBITRATOR MICHEL: So Mr. Chair of the arbitral Panel, do we retain the option - I assume we do, but *I just want to be clear that there's agreement* among the three of us - maybe I should say the five of us, that if -
> ARBITRATOR RENFREW: This includes all the lawyers.
> ARBITRATOR MICHEL: All the lawyers. That if we have further questions, that there's a potential for *a second round of follow-up briefing*.
> 
> \*     \*     \*
> 
> MS. DURIE: That's fine on our side.
> **MR. RIGLER**: *On our side, it's fine* . . . .

*See* Ex. BB (Hr'g Tr. Day 6) at 1363:5-7; 1366:6-25; 1367:2-17. Subsequently, on November 17, 2014—within 15 days of November 3, when Roquette contends that the hearing closed and thus before the Panel was required to issue an award[9]—the Panel did what it had reserved the right to do and what counsel expressly agreed it could do: it asked for "a second round of follow-up briefing." As the Panel explained, it was expressly permitted to request such submissions under the CPR Rules, which grant the Tribunal the power to "hear and determine challenges to its jurisdiction," § 8.1, "conduct the arbitration in such manner as it shall deem appropriate," § 9.1, "require the parties to produce evidence in addition to that initially offered," § 12.3, and "apply the[] Rules insofar as they relate to the Tribunal's powers and duties," § 22. Ex. A at 7.

Notwithstanding the agreement on the record that the proceedings would continue after submission of a first-round of post-hearing briefs, Roquette contends that it did not agree to a

---

[9] According to its second-filed declaratory complaint, Roquette appears to contend that the 15-day deadline for issuance of the Award expired on November 18, 2014 based on a letter from Judge Renfrew indicating a November 3, 2014 close to the arbitral hearing. *See* Case No. 15-125, D.I. 1 ¶¶ 36, 39-41. But, *even if* the Panel had intended to close the hearing on November 3, its November 17 order requesting an additional round of follow-up briefing—which proceeded Roquette's November 18, 2014 deadline—put the parties on notice that the Panel had decided to continue the hearing, just as it said it might do, and as the CPR Rules permit.

second round of briefing but, instead, agreed only that the parties could respond to "specific questions." *See* Ex. Z (Rigler Letter to Panel) at 5 (arguing that Solazyme's December 1, 2014 brief was "in clear disregard of Judge Renfrew's agreement with Mr. Rigler's statement that in responding to 'specific questions' Roquette did not agree to another round of argument."). The Panel correctly rejected this argument and concluded that there "was no such agreement." Ex. A at 9. To the contrary, Mr. Rigler's statement concerning "specific questions" came immediately after his agreement that a second round of follow-up briefing is "fine." Ex. BB (Hr'g Tr. Day 6) at 1367:2-3. The Panel correctly concluded that Mr. Rigler's subsequent qualification regarding "further argument" thus could only have meant oral argument. Ex. A at 9. And, in any case, Mr. Rigler "never challenged the Panel's jurisdiction to have further briefing or oral argument, nor could he have" given the Panel's broad discretion under the CPR Rules. *Id.*

### b. Roquette's Objection Based On The Material Transfer Agreement

Roquette's objection that the Panel lacked the authority to arbitrate disputes under the December 2010 Material Transfer Agreement ("MTA") misses the point. Solazyme's claim for assignment of patent applications has always been premised on the JVOA, which awards Improvements (as defined therein) to Solazyme's intellectual property to Solazyme. Solazyme cited the MTA because that agreement negated Roquette's asserted *defense* that the patent applications that Roquette copied from joint venture filings were not the property of the joint venture and thus could not be assigned to Solazyme.

From the outset of the arbitration, Solazyme sought ownership of the joint venture's improvements to Solazyme's intellectual property pursuant to the JVOA, which authorized the Panel "to grant any temporary, preliminary or permanent equitable remedy or relief that they determine to be just or equitable and within the scope of this Agreement." Ex. B § 22.3(b). Under the terms of the JVOA, any intellectual property developed by Solazyme or Roquette on behalf of the joint venture is owned by SRN. *See* Ex. B § 10.2(c). Indeed, Roquette has

acknowledged that the JVOA governs the ownership of the patent applications at issue. Before the arbitration, Roquette's head of intellectual property agreed that the JVOA, along with the parties' License Agreements, require patent applications to be filed by SRN. Ex. N at RQ 004865 ("Regarding the ownership of the proposed patent application, if I am not mistaken the *license and/or JV agreement* foresee that such patent application will hold by SRN.").

The JVOA provides that any intellectual property developed by or on behalf of the joint venture is owned by the joint venture. That provision is consistent with the parties' other related agreements. For example, the Services Agreement, to which both Solazyme and Roquette are parties and which adopts the arbitration clause of Article 22 of the JVOA, requires Roquette and Solazyme to "irrevocably assign and . . . cause each of their respective employees to assign, without additional consideration, to [SRN] in perpetuity all of Roquette's and Solazyme's and their respective employees' rights, titles and interests" to any intellectual property developed by Roquette or Solazyme "arising out of or in connection" with work done on behalf of SRN. Ex. E § 2.7(a) and § 8.9(b). Similarly, the License Agreements provide that SRN "shall own all right, title, and interest in and to any Improvements, or any new Intellectual Property, reduced to practice or otherwise developed by either Party or any of its Affiliates pursuant to the Services Agreement or the Manufacturing Agreement." Exs. C & D at § 3.1(b).

Roquette did not dispute that research and development work performed by Solazyme and Roquette on behalf of the joint venture belongs to the joint venture. Instead, at the evidentiary hearing, Roquette suggested that the shadow patent applications were the result of research that Roquette had the "right" to undertake independently. *See, e.g.*, Ex. CC (Hr'g Tr. Day 3) at 508:5-9; 512:11-19; 515:1-10. Setting aside the overwhelming evidence that this work was not undertaken by Roquette independently but instead was the result of a joint effort between Solazyme, Roquette, and SRN (which is why near-identical applications were filed in

the name of the joint venture), Roquette had no "right" to use Solazyme or SRN's materials or intellectual property to conduct the supposed "independent" research. To the contrary, the 2010 Material Transfer Agreement and the Manufacturing Agreement make clear that Roquette had no "right" to conduct research and file patent applications in its own name based on work that used SRN's materials (*i.e.*, Solazyme's algal strains), or SRN's processes (*i.e.*, the processes Solazyme transferred to SRN).

Pursuant to the Manufacturing Agreement, SRN would provide Roquette with the "technologies and processes" for the fermentation and downstream processing of SRN's product. This technology transfer was limited to the scope of the work done on behalf of the joint venture: "Roquette shall be entitled to retain a copy of the Technologies and Processes ***solely*** for the purpose of Manufacturing the Products for [SRN]." Ex. F § 2.1(c). The Material Transfer Agreement governed the transfer of Solazyme's algal strains and existing inventory of algal flour from SRN to Roquette and limited the scope of Roquette's "rights" to file patent applications based on the work of the joint venture in its own name:

> (ii) Solazyme owns all intellectual property rights to the Material and Roquette shall not file, or cause to be filed, any patent application directed to the Material and Modified Material or methods of compositions incorporating the Material and Modified Material delivered to Roquette; (iii) Roquette shall not file, or cause to be filed, any patent application directed to the Results, the Material, Modified Material or any method of using or chemically or physically modifying the Material or Modified Material in any patent application . . .

Ex. G § 3.3.

Roquette apparently contends that the Panel lacked jurisdiction because Solazyme's request for assignment of the shadow applications was based on the MTA, which has its own arbitration provision. To the contrary, Solazyme has consistently premised its request on the JVOA, which assigns Improvements (as defined therein) to Solazyme's intellectual property to

Solazyme.  *See, e.g.*, Ex. BB (Hr'g Tr. Day 6) at 1287:10-18; Ex. DD at 46-47.  The shadow patent applications reflect intellectual property of the joint venture that is an Improvement to Solazyme's intellectual property and thus should be assigned to Solazyme pursuant to the terms of the JVOA.  Solazyme cited the Material Transfer Agreement and Manufacturing Agreement to establish that Roquette's ***defense***—that it had a "right" to conduct independent research using Solazyme and SRN's intellectual property and materials—is without merit.  These agreements explicitly limited Roquette's use of Solazyme and SRN's intellectual property to the work it was doing ***on behalf of*** SRN.  The JVOA directs that any intellectual property resulting from any research and development work on behalf of SRN is owned by SRN, and thus the Panel had jurisdiction and authority to resolve the ownership of Roquette's shadow patent applications and assign those applications to Solazyme.  Solazyme's claim thus presented a "dispute of a legal nature arising out of or connected with the interpretation or enforcement of the legal duties, rights and obligations under [the JVOA]."  Ex. B § 22.3(b).  The Panel therefore properly rejected Roquette's jurisdictional objection.  *See* Ex. V (Dec. 23, 2014 Order) at 1 ("The Panel has jurisdiction if Roquette filed patent applications based upon the intellectual property of Solazyme and were developed on behalf of the joint venture.").

*     *     *

Neither of Roquette's challenges presents one of the "very unusual circumstances" in which the record "reveals no support whatsoever for the arbitrator's determination."  *Kaplan*, 514 U.S. at 942; *United Indus. Workers*, 987 F.2d at 170; *Exxon*, 993 F.2d at 360.  To the contrary, the record amply supports the Panel's outcome, and thus this Court should "affirm easily" the Award "under this extremely deferential standard."  *Dluhos*, 321 F.3d at 370.

## V.     CONCLUSION

Solazyme respectfully requests that the Court grant its Motion to Confirm the Panel's Award and for Entry of Judgment on the Award pursuant to Federal Rule of Civil Procedure 58.

OF COUNSEL:

Daralyn J. Durie
Joshua H. Lerner
Laura E. Miller
Timothy C. Saulsbury
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111-3007
(415) 362-6666
ddurie@durietangri.com
jlerner@durietangri.com
lmiller@durietangri.com
tsaulsbury@durietangri.com


Dated:  March 11, 2015

*/s/ Frederick L. Cottrell, III*

Frederick L. Cottrell, III (#2555)
Chad M. Shandler (#3796)
Selena E. Molina (#5936)
RICHARDS, LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
shandler@rlf.com
molina@rlf.com

*Attorneys for Defendant and Counterclaimant
Solazyme, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2015, I caused to be served copies of the foregoing

document in the manner indicated below and electronically filed the same with the Clerk of

Court using CM/ECF, which will send notification of such filing to the following counsel of

record:

**BY EMAIL**
Kenneth J. Nachbar
Brendan W. Sullivan
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
knachbar@mnat.com
bsullivan@mnat.com

Douglas V. Rigler
Jeffrey M. Goehring
YOUNG & THOMPSON
209 Madison Street, Ste. 500
Alexandria, VA 22314
703 521-2297
drigler@young-thompson.com
jgoehring@young-thompson.com

*Attorneys for Plaintiff and Counter-Defendant*
*ROQUETTE FRÈRES, S.A.*

_/s/ Selena E. Molina_
Selena E. Molina (#5936)