IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROQUETTE FRÈRES, S.A., | ) |
| | ) |
| Plaintiff and Counter-Defendant, | ) |
| | ) |
| v. | ) Civ. No. 14-1442-SLR |
| | ) (Cons.) |
| SOLAZYME, INC., | ) |
| | ) |
| Defendant and Counterclaimant. | ) |

---

Kenneth J. Nachbar, Esquire, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Douglas V. Rigler, Esquire and Jeffrey M. Goehring, Esquire of Young & Thompson.

Frederick L. Cottrell, III, Esquire, Chad M. Shandler, Esquire and Selena E. Molina, Esquire of Richards, Layton & Finger, PA, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Daralyn J. Durie, Esquire, Joshua H. Lerner, Esquire, Laura E. Miller, Esquire, Timothy C. Saulsbury, Esquire of Durie Tangri LLP.

---

**MEMORANDUM OPINION**

Dated: December 21, 2015
Wilmington, Delaware

ROBINSON, District Judge

## I. PROCEDURAL BACKGROUND

Pending before the court are multiple motions filed by the parties following an 18

month-long arbitration. Roquette Frères, S.A. ("Roquette") is a French corporation with

its principal place of business in Lestrem, France. Solazyme, Inc. ("Solazyme") is a

Delaware corporation with its principal place of business in South San Francisco,

California. The court has jurisdiction pursuant to 28 U.S.C. § 1332.

Roquette initiated the litigation by filing

an action for a declaratory judgment that any award rendered by the CPR
International Institute for Conflict Prevention & Resolution in the arbitration
between Roquette and Solazyme is invalid and vacated and that the
arbitration was terminated prior to the issuance of any award. A further
declaration is sought that Roquette and Solazyme are joint owners of the
assets, including Intellectual Property, of Solazyme Roquette Nutritionals,
LLC ("SRN"), a now dissolved 50/50 joint venture between Roquette and
Solazyme.

(Civ. No. 14-1442, D.I. 1) Roquette filed a second declaratory judgment action in which

it asserted

1) that the authority of an arbitral panel had terminated such that its order
for more discovery and new hearings is unenforceable and, 2) alternatively,
that regardless of whether the panel's authority had terminated, proposed
new discovery and hearing concerns an issue which is outside of the scope
of the arbitral agreement under which the panel purported to act.

(Civ. No. 15-125, D.I. 1) The two actions were thereafter consolidated, with all future

filings being filed only in the lead, first-filed case. (Civ. No. 14-1442, D.I. 14; Civ. No.

15-125, D.I. 5)[1]

Solazyme's answer to Roquette's consolidated allegations included a

counterclaim for confirmation of the arbitration award pursuant to 9 U.S.C. § 207, as

_____

[1]All docket item entries, therefore, refer to the docket in Civ. No. 14-1442.

well as counterclaims asserting trade secret misappropriation and breach of contract (D.I. 15). This pleading was followed by the filing of seven motions: (1) Solazyme's motion for an order confirming the arbitration award (D.I. 16); (2) Solazyme's motion for a preliminary injunction (D.I. 26); (3) Roquette's motion for summary judgment granting declaratory relief in its first declaratory judgment action (D.I. 43); (4) Roquette's motion for summary judgment granting declaratory relief in its second declaratory judgment action (D.I. 47); (5) Roquette's motion for an order vacating the arbitration award (D.I. 52); (6) Roquette's motion for summary judgment for failure to identify trade secrets (D.I. 106); and Roquette's motion for summary judgment of Solazyme's claim for misappropriation of trade secrets (D.I. 110). Oral argument was heard on July 28, 2015.

## II. FACTUAL BACKGROUND

Roquette and Solazyme were parties to a Joint Venture Operating Agreement dated November 3, 2010 (the "JVOA") in which they formed a joint venture called Solazyme Roquette Nutritionals, LLC ("SRN" or the "Joint Venture"). According to the JVOA, SRN was established for the purpose of "the research and development, manufacture, distribution, sales, marketing and support" of products made with "microalgae-containing and microalgae-derived substances" as ingredients for use in human foods and beverages, nutraceuticals, and animal feeds. (D.I. 36, ex. B at § 2.2 and ex. A at 4 and 7) The SRN joint venture was owned 50/50 by each of its two members.

As described in the JVOA, Roquette is a "global producer of starch and starch-based derivatives with expertise in the research, development, manufacture and sale of

bio-products and the provision of related marketing, distribution, technical and administrative services, and Roquette also possesses certain intellectual property that could be used or useful in the development and production of products in the Field. . . ." (*Id.* at 1) Solazyme was described as "a renewable oil and bio-products company with certain intellectual property in the area of algal biotechnology that could be used or useful in the development and production of products in the Field." (*Id.*)

By 2013, "it became clear to the Parties that SRN was to dissolve" and "a dispute arose as to the proper assignment of SRN's intellectual property. Pursuant to the JVOA, the parties submitted to arbitration to resolve the dispute." (D.I. 15, ¶ 27) The parties served simultaneous arbitration demands on September 24, 2013. With both parties citing to § 21.1 of the JVOA,

> Roquette demanded an arbitral award that it was a joint owner of SRN's intellectual property and that said intellectual property should be jointly assigned to Roquette and Solazyme. Solazyme demanded an arbitral award that it was the sole owner of SRN's intellectual property because all of SRN's intellectual property improved upon the intellectual property Solazyme contributed to SRN . . . .

(D.I. 15, ¶ 28)

The arbitral hearing commenced on September 25, 2014, and concluded on October 2, 2014. The parties and the three arbitrators ("the Panel") agreed at the conclusion of the hearing to the simultaneous serving of post-hearing briefs on October 23, 2014, and to keeping the hearing open until the Panel had "gotten the briefs."[2] (D.I.

---

[2]Pursuant to the JVOA, Article 22.3(b), "[w]ithin fifteen (15) days after the conclusion of the arbitration hearing, the arbitrators shall issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, inclding the calculation of any damages awarded." (D.I. 36, ex. B)

18, ex. BB at 1363) If the Panel "had further [specific] questions, there was a potential for a second round of follow-up briefing." (*Id.*, ex. BB at 1366) In response to the Panel's query about the level of detail the parties expected, counsel indicated that Roquette expected a "reasoned award," i.e., an award that provided "a reason" with "[t]he same detail as when we tell you the extent of the know-how." (*Id.*, ex. BB at 1364-65)

The Panel subsequently notified the parties that the conclusion of the arbitration hearing would instead take place on November 3, 2014, to accommodate travel abroad by one of the arbitrators. (D.I. 45, ex. 3) According to Roquette, the deadline for filing a decision was 15 days later, or November 18, 2014. (D.I. 44 at 2) On November 17, 2014, the Panel issued an Order which invited a further motion practice on two issues, the award of attorney fees and "newly discovered additional patent applications relating to the Joint Venture;" such motions were to be filed by December 1, 2014. (D.I. 18, ex. P) By letter dated November 26, 2014, Roquette objected to said order and to the fact that no decision had issued within the required 15-day period. (*Id.*, ex. Q) Roquette's objection was overruled. (*Id.*, ex. S) Solazyme filed its motion regarding fees and further evidence on December 1, 2014. (*Id.*, ex. T) In response, Roquette maintained its objection to the jurisdiction of the Panel to resolve the parties' dispute, which objection was, again, overruled. (*Id.*, exs. U, V) By order dated February 10, 2015, the Panel directed Solazyme to identify for the Panel "all of the presently known patent applications filed by Roquette which Solazyme contends constitutes improvements to its intellectual property and/or were based upon work done using Solazyme microalgal

4

strain and based upon Solazyme's pre-SRN know[-]how." (*Id.*, ex. X) Also by order

dated February 10, 2015, the Panel closed the hearing. (*Id.*, ex. Y) The Panel's

decision ("the Award") issued on February 19, 2015. (*Id.*, ex. A) The Panel awarded to

Solazyme "[a]ll of the patent applications currently assigned to SRN," as well as "[a]ll of

SRN's know-how related to the production of the SRN products" with certain identified

properties. The Panel also awarded to Solazyme "[a]ll Roquette patent applications

filed on or after November 3, 2010 relating to microalgal foods, microalgal food

ingredients, and microalgal nutritionals, as well as all methods relating to making and

using the same, including but not limited to those" patents listed by the Panel. (*Id.*, ex.

A at 33-35) Roquette objects to the Award on a number of grounds.

## III. ANALYSIS

### A. Arbitration Proceedings

#### 1. Applicable law

Section 22.3(b) of the JVOA provides in relevant part as follows:

(b) **Legal Disputes.** Any dispute of a legal nature arising out of or connected with the interpretation or enforcement of the legal duties, rights and obligations under this Agreement, including without limitation, its validity, application (including whether a product is within the Field) or termination, that cannot be settled by negotiation pursuant to Section 22.1 or mediation pursuant to Section 22.2 shall be referred to and finally resolved by arbitration under the Arbitration Rules of the Center for Public Resources in New York. The arbitration shall consist of a single arbitrator mutually agreed by the Parties, or, in the absence of such agreement, the arbitration shall consist of a panel of three (3) arbitrators who shall arbitrate the dispute . . . . Any arbitration shall take place in New York, New York and any arbitration proceeding shall be conducted according to the laws of the State of Delaware. Within fifteen (15) days after the conclusion of the arbitration hearing, the arbitrators shall issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any

5

> damages awarded. The arbitrations [sic] shall not be authorized to reform, modify or materially amend this Agreement or any other agreements contemplated hereby.

(D.I. 36, ex. B at 53) Section 23.8 provides that the JVOA "shall be governed and construed in accordance with the laws of the State of Delaware. . . ." (*Id.* at 55)

Roquette maintains that the laws of the State of Delaware control not only the substantive legal issues (i.e., interpretation of the parties' contract), but the standard of review relating to the arbitration proceeding itself. Solazyme argues that the arbitration award should be reviewed under the Federal Arbitration Act, 9 U.S.C. § 1, et seq. As with most issues, the answer is not incontrovertible.

Although the JVOA makes a distinction between the procedural and substantive aspects of the agreement, both § 22.3(b) ("any arbitration proceeding shall be conducted according to the laws of the State of Delaware") and § 23.8 (the agreement between the parties "shall be governed and construed in accordance with the laws of the State of Delaware") refer to Delaware law. (*Id.* at 53, 55) However, the applicable Delaware statute itself indicates that the JVOA was not crafted with Delaware law in mind. More specifically, 10 Del. C. § 5701 provides that "[a] written agreement to submit to arbitration any controversy existing at or arising after the effective date of the agreement is valid, enforceable and irrevocable, . . . and confers jurisdiction on the Chancery Court of the State to enforce it and to enter judgment on an award." Section 5702(a) provides that "[t]he making of an agreement described in § 5701 of this title **specifically referencing the Delaware Uniform Arbitration Act [§ 5701 et seq. of this title] and the parties' desire to have it apply to their agreement** confers

jurisdiction on" the Court of Chancery of the State of Delaware "to enforce the
agreement." (Emphasis added) Section 5702(c) provides that, "[u]nless an arbitration
agreement complies with the standard set forth in subsection (a) of this section for the
applicability of the Delaware Uniform Arbitration Act, any application to the Court of
Chancery to . . . vacate or enforce an arbitrator's award shall be decided by the Court of
Chancery **in conformity with the Federal Arbitration Act [9 U.S.C. § 1 et seq.], and
such general principles of law and equity as are not inconsistent with that Act. In
such cases, the other provision of this Delaware Uniform Arbitration Act are
without standing . . . ."** (Emphasis added)

Clearly, the JVOA does not "specifically" reference the Delaware Uniform
Arbitration Act and, indeed, Roquette (the proponent of such) did not file its declaratory
judgment action to vacate the arbitration award in the Court of Chancery, as
contemplated by the Delaware statute. Consistent with Delaware law, then, absent
compliance with § 5702(a), the Federal Arbitration Act ("the Act") applies pursuant to §
5702(c).

## 2. Standard of review[3]

Under the Act, a court's function in reviewing a commercial arbitration award is
"narrow in the extreme" and is "extremely deferential." *Amalgamated Meat Cutters v.
Cross Bros. Meat Packers, Inc.,* 518 F.2d 1113, 1121 (3d Cir. 1975); *Dluhos v.
Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003). Indeed, the Act's "exclusive regimes for

---

[3]Although Roquette filed motions for summary judgment to grant declaratory
relief (to wit, to vacate the arbitration award), the court looks to the Act rather than Fed.
R. Civ. P. 56 for the appropriate standard of review.

the review" of such an award are confined to §§ 10 and 11 of the Act. *Hall St. Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 590 (2008). This deferential standard of review has been explained as follows: "[W]hen parties agree to resolve their disputes before an arbitrator without involving the courts, the courts will enforce the bargains implicit in such agreements by enforcing arbitration awards absent a reason to doubt the authority or integrity of the arbitral forum." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012) (citing *Mattel*, 552 U.S. at 586). Roquette does not question the integrity of the Panel. Therefore, the pending motion to vacate must be reviewed pursuant to § 10(a)(4) of the Act, which provides that an award may be vacated "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).

The Third Circuit has recognized that an arbitration agreement "may place limits upon the arbitrator's powers that are enforceable by the courts. . . . An arbitrator oversteps these limits, and subjects his award to judicial vacatur under § 10(a)(4). . . ." *Sutter*, 675 F.3d at 219. Put another way,

> the task of an arbitrator is to interpret and enforce a contract. When he makes a good faith attempt to do so, even serious errors of law or fact will not subject his award to vacatur. . . . But when the arbitrator "strays from interpretation and application of the agreement and effectively 'dispenses his own brand of industrial justice,'" he exceeds his powers and his award will be unenforceable.

*Id.* at 220 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.,* 559 U.S. 662, 671 (2010)). In sum, a court should uphold an arbitration award that "'draws its essence'" from the contract, because "'the parties have bargained for the arbitrator's decision, [and] 'it is the abitrator's view of the facts and of the meaning of the contract

that they have agreed to accept.'" *The Major League Umpires Assoc. v. The American League of Professional Baseball Clubs*, 357 F.3d 272, 280 (3d Cir. 2004) (citations omitted). "'An award may fairly be said to 'draw[ ] its essence from the . . . agreement if the interpretation can in **any rational way** be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention.'" *Id.* (citations omitted) (emphasis in original).

The question before the court, therefore, is whether the Panel, in its Award, demonstrates "manifest disregard" for the JVOA. "Manifest disregard for the [JVOA] is established when the [Panel's] award is 'totally unsupported by principles of contract construction.'" *Id.* (citations omitted).

### 3. Discussion

#### a. 15-day limit

Roquette argues in connection with its motion for summary judgment filed in the first declaratory judgment action that the Panel did not have jurisdiction to make the Award because the Panel violated the 15-day limit to do so under the JVOA. In this regard, although Roquette does not dispute that it agreed to keep the hearing open until post-trial briefs were submitted (due on November 3, 2014), Roquette maintains that keeping the hearing open for receipt of new material to accommodate the Panel's February 19, 2015 award is violative of the JVOA.

Section 22.3(b) requires the arbitration award to be made within 15 days "after the conclusion of the arbitration hearing." The Panel, in its Award, spent considerable

9

time justifying the process it embraced, citing to the "CPR Arbitration Rules"[4] to support
its logic: (1) the Panel had the "power to hear and determine challenges to jurisdiction;"
(2) the Panel had the authority to "conduct the arbitration in such manner as it [deemed]
appropriate; (3) the Panel, "in its discretion," could "require the parties to produce
evidence in addition to that initially offered;" and (4) the Panel "shall interpret and apply
these Rules insofar as they relate to the [Panel's] powers and duties." (D.I. 18, ex. A at
6-7, citing CPR Arbitration Rules 8.1, 9.1, 12.3, and 22) According to the Panel, then, it
had the discretion to determine when the hearing was concluded in order to pull the
trigger on the 15-day deadline.

The Third Circuit, following Supreme Court precedent, has held that
"'[p]rocedural questions which grow out of the dispute and bear on its final disposition
are presumptively not for the judge, but for an arbitrator, to decide,' as are 'allegation[s]
of waiver, delay, or a like defense to arbitrability.'" *Puleo v. Chase Bank USA, N.A.*, 605
F.3d 172, 179 (3d Cir. 2010) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S.
79, 84 (2002)). Given the broad language of the CPR Rules, and the deference given
to arbitrators vis a vis the procedure they follow, the court concludes that the Panel's
interpretation of the JVOA's 15-day limit can rationally be derived from "the agreement,
viewed in light of its language, its context, and . . . other indicia of the parties' intention."
*Major League*, 357 F.3d at 280.

### b. Cross-motions to confirm/vacate

Roquette offers four reasons to vacate the Award at issue: (1) the Panel

---

[4]The Rules of the Center for Public Resources ("CPR") in New York (now the
International Center for Conflict Prevention & Resolution).

Case 1:14-cv-01442-SLR   Document 153   Filed 12/21/15   Page 12 of 21 PageID #: 6900

proceeded in manifest disregard of established Delaware law when it considered

extrinsic evidence in connection with an unambiguous contract; (2) the Panel exceeded

its powers when it considered a material transfer agreement rather than confining its

review to the JVOA; (3) the Award violates public policy; and (4) the Panel dispensed its

"own brand of industrial justice." Although somewhat overlapping, the court will address

each in turn.

## (1) Review of extrinsic evidence

As described by the Panel, the principal issue in the arbitration was "the

disposition of Intellectual Property owned by SRN upon its dissolution." (D.I. 18, ex. A

at 21) In resolving that issue, the Panel reviewed the language of the JVOA as it

related to the parties' intellectual property. Specifically, § 21.1(c) of the JVOA provides

that, "[u]pon dissolution of the Company, the intangible assets of the Company . . . shall

be treated as follows:"[5]

(i) all Improvements to the Licensed Intellectual Property licensed to the
Company by Solazyme, and any improvements, enhancements or refinements thereto
made after the Accumulation Termination Date, shall be assigned by the Company to
Solazyme;

(ii) all improvements to the Licensed Intellectual Property licensed to the
Company by Roquette, and any improvements, enhancements or refinements thereto
made after the Accumulation Termination Date, shall be assigned by the Company to
Roquette.

(iii) all other intangible rights owned by the Company shall be assigned by
the Company jointly to Roquette and Solazyme, each of which shall have the right to
use, practice and license such Intellectual Property for any and all uses, without any
accounting to the other.

(D.I. 36, ex. B at 51) Consistent with the language above, the word "improvements"

---

[5]"[C]apitalized terms used in the Section 21.1(c), but not defined in this
Agreement, shall be as defined in the License Agreements." (D.I. 36, ex. B at 50)

11

was not a defined term in the JVOA. The Panel, therefore, referred to the definition of

"improvements" found in the parties' respective license agreements:

> **"Improvements"** shall mean any improvements, enhancements,
> modifications or refinements, patented or not, to the Licensed Intellectual
> Property that are reduced to practice or otherwise developed prior to the
> Accumulation Termination Date, by the applicable Party alone or in
> collaboration with one or more Third Parties, which are Controlled by the
> applicable Party.

(D.I. 36, exs. C and D, § 1.15)  In this regard, Roquette argued that it was inappropriate

to look to the definition of Improvements in the Solazyme License Agreement because

it was not specifically mentioned in § 23.15 of the JVOA. And, indeed, that is the case;

however, the Solazyme License Agreement is virtually identical to the Roquette License

Agreement and both were included as exhibits to the JVOA and referred to on the

signature page of the JVOA. (*Id.*, ex. B at 58 and ex. C)

In connection with § 21.1(c) of the JVOA, "[e]ach party had an expert who opined

on whether the Intellectual Property it had brought to [SRN] was improved upon." (D.I.

18, ex. A at 28)  The Panel found the expert for Solazyme to be the more persuasive

and credible. (*Id.*)  It is clear to the court that the Panel had to review extrinsic evidence

to resolve this issue and, therefore, finds no reason to vacate on that basis.

### (2) Material transfer agreement

Roquette also argues that the Panel exceeded its powers when it referred in the

Award to a certain material transfer agreement ("the MTA"):

> As part of the negotiations between the parties, they adopted a Material
> Transfer Agreement, dated July 14, 2009. Solazyme agreed to furnish to
> Roquette for testing and evaluation certain materials it had developed.
> They were the products and processes that Solazyme contributed to the
> Joint Venture and are the products and related intellectual property now in

12

dispute; the high lipid algal flour and the high protein algal powder. In the Agreement, Roquette acknowledged Solazyme's ownership of them and agreed not to file any patent application directed to the "material" delivered to Roquette. "In the event that Roquette filed any patent application in breach of this Section, Roquette further agreed that Solazyme shall own any such patent application or resulting patent."

(*Id.,* ex. A at 14-15) The MTA was entered into before the parties executed the JVOA

and provides for separate remedies under the laws of the State of New York. (D.I. 81,

ex. 1) Importantly, it is not mentioned in § 23.15 of the JVOA[6] and not attached to the

JVOA, as were the other agreements therein mentioned. (D.I. 36, ex. B at SOLAZYME-

00143373-76) Nevertheless, the Panel found that Roquette had breached § 3.3 of the

MTA "and that the so-called shadow patent applications filed by Roquette and all

patents that may be subsequently issued, and the related know-how, now the property

of Roquette, belong to Solazyme and must be assigned by Roquette to Solazyme." (D.I.

18, ex. A at 31)

    The court concludes that the Panel did not exceed its authority in reviewing the

---

[6]Section 23.15 provides in relevant part that the JVOA

> is being executed in conjunction with the Roquette License Agreement, the Manufacturing Agreement and the Services Agreement, which, taken together, collectively represent the entire understanding and agreement between the Parties with respect to the subject matter of and the transactions contemplated by this Agreement. The provisions of this Agreement shall be construed within the four corners of this Agreement; **provided, however***,* that reasonable efforts shall be made to interpret and give full force and effect to the provisions of this Agreement in a manner that is not inconsistent with the interpretation given to the relevant provisions of the foregoing agreements and that gives full force and effect to all relevant provision of the foregoing agreements in their entirety. . . .

(D.I. 36, ex. B at 56)

MTA in connection with its task of determining whether improvements were made to Solazyme's intellectual property, pursuant to § 21.1(c)(i) of the JVOA, as the MTA shed light on that issue. The court will discuss *infra* whether the Panel's substantive ruling on the MTA impacts the confirmability of the Award.

### (3) Public policy

As noted above, the Panel concluded that "the improvement to the Intellectual Property at issue are the property of Solazyme," and "that Roquette is presently attempting to patent intellectual property in its own name and marketing products that are based upon intellectual property and products that Solazyme contributed to " SRN. (D.I. 18, ex. A at 30) Therefore, Solazyme was "entitled to be assigned all of the improvements SRN made to Solazyme's intellectual property." This general conclusion is properly within the scope of the Panel's charge under the JVOA. In more specifically defining what "improvements" were to be assigned, the Panel identified the following: (1) "[a]ll of the patent applications currently assigned to SRN;" (2) "[a]ll of SRN's know-how related to the production of the SRN products, including all know-how related to the production of whole cell microalgal products with" certain enumerated properties; and (3) "[a]ll Roquette patent applications filed on or after November 3, 2010 relating to microalgal foods, microalgal food ingredients, and microalgal nutritionals, as well as all methods relating to making and using the same, including but not limited to those listed" in several tables attached to the Award. (D.I. 18, ex. A at 33-35)

Roquette challenges the Award as being so broad as to "curtail Roquette's ability to compete in the manufacture or sale" of all microalgal food products, in effect granting Solazyme monopoly power in the microalgal food market and violating the public policy

14

against monopolization. (D.I. 53 at 15) Solazyme's response is two-fold: (1) there is no authority which stands for the proposition that a commercial arbitration award may be vacated on public policy grounds; and (2) the breadth of the relief awarded by the Panel is due to Roquette's own failure to comply with the discovery ordered by the Panel; i.e., "[b]ecause Roquette refused to provide any discovery, the Panel was left with no way to delineate between the patent applications to which Solazyme was entitled (because they represented improvements to the intellectual property Solazyme contributed to SRN) and any patent applications that Roquette was entitled to retain." (D.I. 67 at 13)

There is no case law directly on point. And, indeed, it is not surprising that Roquette's public policy argument has either not been presented or has not prevailed in the context at bar, when commercial arbitration awards are reviewed with great deference and patents constitute exceptions to the general rule against monopolies. The court declines to create case law out of whole cloth under the circumstances at bar.

### (4) Industrial justice

Roquette's final argument is that, by acting outside the scope of its contractually delegated authority, the Panel exceeded its authority and dispensed its own brand of industrial justice. *See Newark Morning Ledger Co. v. Newark Typographical Union, Local 103*, 797 F.2d 162, 165 (3d Cir. 1986); *Pa. Power Co. v. Local Union #272 of the Int'l Bhd. of Elec. Workers*, 886 F.2d 46, 49-51 (3d Cir. 1989). Although the court has concluded that the Panel exceeded its authority by substantively reviewing the MTA

15

and finding a breach thereof, it is not clear whether the Panel exacerbated that conduct

by using the breach as a basis for the broad relief granted to Solazyme, and/or whether

the relief itself is so broad as to be outside the scope contemplated by the JVOA.

The JVOA is a complicated contract, written to accommodate the sharing of

highly confidential, technical information between two potential competitors. In broad

strokes, the JVOA imposed rigorous confidentiality obligations on the parties in § 17.1,

recited in relevant part as follows:

Each Party agrees that, for the Term and for five (5) years thereafter, such
Party shall, and shall ensure that its officers, directors, employees and agents
shall, keep completely confidential . . . and not publish or otherwise disclose
and not use for any purpose except as expressly permitted hereunder any
**Confidential Information** or materials furnished to it by the other Party
(**including,** without limitation, **know-how of the disclosing Party**). The
foregoing obligations shall not apply to any information disclosed by a
Party hereunder to the extent that the receiving Party can demonstrate
with competent evidence that such information:

(a) was already known to the receiving Party or its
Affiliates, other than under an obligation of confidentiality to the disclosing
Party, at the time of disclosure;

(b) was generally available to the public or otherwise part
of the public domain at the time of its disclosure to the receiving Party;

(c) became generally available to the public or otherwise
part of the public domain after its disclosure and other than through any
act or omission of the receiving Party in breach of this Agreement;

(d) was subsequently lawfully disclosed to the receiving
Party or its Affiliates by a third party other than in contravention of a
confidentiality obligation of such third party to the disclosing Party; or

(e) was developed or discovered by employees of the
receiving Party or its Affiliates who had no access to the Confidential
Information of the disclosing Party.

(D.I. 36, ex. B at § 17.1) (emphasis added)  Each party contributed to SRN certain

16

"Licensed Intellectual Property" via the license agreements. (D.I. 36, exs. C and D)

Consistent with the definition of "Intellectual Property" provided in the respective license

agreements, "Licensed Intellectual Property" included, inter alia, patents and know-how.

(*See id.*, ex. B at SOLAZYME_00143358; ex. C at § 1.16, 1.18) "Know-How" was

defined as

> any and all information comprising (a) ideas, discoveries, inventions,
> **improvements or trade secrets**, (b) research and development data,
> such as biological, dietary, nutritional, analytical or quality control data,
> in each case together with supporting documentation, (c) databases,
> practices, experience, methods, techniques, specifications, formulations,
> formulae, processes, and Manufacturing information, (d) tangible
> compositions, e.g., microalgal strains, and (e) business, marketing and
> regulatory data, in each case, that are not generally known or available
> to the public as a compilation of information.

(*Id.*, ex. C at § 1.17) (emphasis added) With respect to each party's "Know-How," the

license agreements provided that, e,g,, "Solazyme Know-How" shall mean "all Know-

How Controlled by Solazyme on or before the Accumulation Termination Date that is

necessary or useful to the research and development, Manufacture, distribution, sales,

marketing and/or support of Products and corresponding Services in the Field." (*Id.*, ex.

C at § 1.30)

Although the JVOA is somewhat circular in its language, the goal of the JVOA is

apparent and logical. If a party contributed intellectual property (patents or know-how)

to the joint venture, that party should be the one who benefits from the improvements

thereto if the joint venture was terminated; otherwise, the other party would get a

windfall (not only access to confidential information, but the benefit of improvements to

such). Right or wrong, the Panel determined that (1) "the improvements to the

Intellectual Property at issue are the property of Solazyme," and (2) § 23.1(c)(i), not §

17

23.1(c)(iii) (as Roquette argued), was the operative provision of the JVOA upon which to base the Award. As far as the court can tell from the record, Roquette was given its bargained-for opportunity to demonstrate that the know-how it used in connection with its patent applications was its own or publicly available, but failed to participate in this aspect of the arbitration proceeding. Therefore, although the relief granted in the Award is broad in scope, the court concludes that the Panel did not exceed its authority in this regard, nor did the Panel base the Award (to any determined extent) on the breach of the MTA.

### 4. Conclusion

Consistent with the above reasoning, the court confirms the Award. More specifically, the court grants Solazyme's motion for an order to confirm the Award and denies Roquette's motion for an order to vacate the Award, as well as Roquette's motions for summary judgment as to its declaratory judgment actions. Judgment shall be entered accordingly.

### B. Misappropriation of Solazyme's Trade Secrets

Which leaves the court with the tangle of motions relating to Solazyme's counterclaim. The record indicates that Solazyme filed a motion for a preliminary injunction only because Roquette refused to comply with the Award and continued to claim it had "ownership rights to the products, manufacturing capacity, and the head start that manufacturing capacity provides." (D.I. 27 at 3) Roquette responded with two motions for summary judgment, one based on Solazyme's "failure to identify trade secrets" and one based on several interrelated novel theories which cannot be

18

summarized easily. Quite frankly, the court is not confident that these motions are either necessary (in the case of Solazyme's motion for injunctive relief) or appropriate (in the case of Roquette's motions), given the court's understanding that the trade secrets at issue in Solazyme's counterclaim are the same trade secrets ("know-how") addressed by the Panel in the Award, and the Award has now been confirmed and judgment entered. As noted above, these parties entered into a contract by which they agreed to resolve the distribution of SRN's assets (including intangible assets like trade secrets) through arbitration. Although the court recognizes that Roquette (viewed in the most charitable light) lost confidence in the arbitration process and stopped participating as a result, nevertheless, the identification and disposition of such assets as the parties' respective trade secrets was within the scope of the arbitration and was addressed (even if addressed incorrectly).[7] The court will not decide these pending motions until the parties identify what issues, if any, remain for resolution after judgment is entered on the Award.

## IV. CONCLUSION

For the reasons stated, Solazyme's motion for an order confirming the Award (D.I. 16) is granted, and Roquette's motion for an order vacating the Award (D.I. 52) is denied, as are its motions for summary judgment relating to the Award (D.I. 43, D.I. 47). Because some or all of the remaining motions may be mooted or resolved by the entry of judgment in favor of Solazyme, the court declines to address the merits of such

_____

[7]Again, Roquette apparently did not bring to the arbitration proceeding all of the evidence and arguments it could have. That, combined with the inherent difficulty of determining what "know-how" is and by whom and when it was derived, surely made the "bargained-for" dispute resolution process a complex one to execute.

motions pending further submissions of the parties.  An order shall issue.